## KRAMER *v.* ARTHURS and NICHOLSON.

A joint-stock company to deal in land, is essentially a partnership, and land purchased by it as an article of trade is not subject to judgment and execution at the suit of a separate creditor; and a purchaser, with notice, by a voluntary or an involuntary conveyance of the interest of one of the partners, is to be postponed to a subsequent purchaser of the interest of the firm.

The purchaser of an equitable title is a purchaser with notice, and takes subject to prior equities, though they were actually unknown to him.

By articles of copartnership, the firm of A. and B. and nineteen other shareholders, constituted themselves a joint-stock company to deal in land, for three years; at the end of which, the capital and profits were to be divided. A. and B. were the active agents of the company, and ostensible owners of its lands, buying and selling in their own names, and executing secret declarations of trust in its favour, and recording them when required to do so. B. was also the owner of a half-share in the company's stock. By the articles they were to receive a third of the net profits in compensation of their services. They purchased, by written agreement, a tract of land from C. and paid the purchase-money; after which, A. sold his interest in the land and in the profits of the concern to B., who thenceforth became the sole agent of the company. Subsequent to the purchase and payment, judgment was obtained by a separate creditor of A. and B.; and still later, B. agreed to sell part of the land bought from C. to D., who directed the conveyance of the legal title to be made immediately from C. to E. The firm of A. and B. was a creditor of the company, which was insolvent. *Held,* that the interest of A. and B. in the land, was not bound by the judgment of their separate creditor.

As the ownership of such a partner is not the estate of a tenant in common in the lands, but a resulting interest in the proceeds, it is not bound by a judgment for his separate debts, though it is bound by a judgment for a partnership debt.

In error from the District Court of Allegheny.

*Nov.* 1. This was an ejectment in which the main question was, whether either Havens or Wetmore had such an interest in the land in question as could be sold by the sheriff under a judgment against them—which judgment had been assigned to Arthurs and Nicholson, who became the purchasers at the sheriff's sale.

In September, 1835, Halsey and nineteen others of New York,

under the style of the " Pittsburgh Land Company," as parties of the first part, executed an indenture with Wetmore and Havens, of the other part—reciting that the parties of the first part had associated themselves for the purpose of purchasing, selling, and improving real estate in Pittsburgh and its vicinity, and for no other purpose, and had agreed to furnish a capital for that purpose of $100,000, to be divided into shares of $5000 each, and also to constitute Wetmore and Havens their agents, attorneys, and trustees for the execution of the said objects.   It was further agreed that Wetmore and Havens should purchase, sell, exchange and mortgage real estate in or near Pittsburgh, as they should deem most advantageous to the parties of the first part, subject to the conditions of this agreement.   The deeds for the land were to be taken in the names of Wetmore and Havens absolutely, who were immediately to execute a declaration of trust, setting forth that they held in trust to sell and convey, and to receive the purchase-money in trust for the parties of the first part under the conditions of this agreement, and to convey the residue undisposed of to the parties of the first part on payment of advances, &c., and receiving their share of the concern under the agreement.   This declaration of trust was not to be put on record until the majority of the parties of the first part should deem it proper.   Wetmore and Havens had full power given to sell, convey, and re-invest the proceeds, and to improve by building to a limited extent, and they agreed to purchase no real estate on their own account.   Transferable certificates were to be issued to the shareholders, and at the end of three years, unless the company should continue longer by agreement, the transactions were to be brought to a close, and the moneys and proceeds of sales to be applied, 1st, to pay obligations contracted in the purchases. 2. To reimburse the payments by the shareholders with interest. 3. One-third of the residue between Wetmore and Havens, which was to be in full for their services, and the remaining two-thirds among the shareholders.   In case of a loss, Wetmore and Havens were to bear one-third of it.

This deed was executed by the parties, and also by Havens, for one share of the stock held by himself jointly with one Baldwin.

On the 22d of January, 1837, an indenture tripartite was entered into between Wetmore of the first part, Havens of the second, and the parties of the first part in the previous deed as parties of the third part, in which, after reciting the previous deed, and that various purchases and declarations of trust had been made, Wetmore, with the assent of the other parties, conveyed to Havens all

his interest in the real estate held in conjunction with him, and all his interest in the profits—Havens taking upon himself the execution of the trusts. These instruments were not recorded.

On the 23d August, 1836, one Lee had executed a sealed agreement with Wetmore, by which he contracted to convey four acres of land, of which that in question formed a part, belonging to Luckey, within two months. Wetmore agreed to pay to Luckey or his attorney, $3000 in hand or in secured notes at ninety days, and $10,000 in four annual payments.

In December, 1838, Wetmore, by deed recorded in the next month, conveyed his interest in the lands purchased of Luckey to Havens. The plaintiffs proved a recognition of the contract made by Lee with Wetmore, in the letters of Luckey to Wetmore & Havens, written in 1838, and a ratification of that contract by Luckey, and a receipt of the purchase-money under it at the time of his execution of a deed to one Patterson in January, 1839, which was recorded, April 1, 1840: which deed was made at the request of Havens, and in pursuance of a contract between himself and Stewart for the sale of the land.

Havens proved that the purchase from Luckey was made on behalf of the "Pittsburgh Land Company," and that he had given Luckey the securities for the purchase-money: these were obtained from a sale of other parts of the property purchased from Luckey. The deeds to those purchasers were made directly from Luckey or his attorney.

He further proved that he had agreed to sell the property in question to one Stewart on the 11th Feb., 1839; but, by his direction, he procured the deed to be made from Luckey to Patterson. A deed from Havens had been drawn, but was not executed, probably (the witness said) on account of his pecuniary embarrassments.

It was also in evidence that the Land Company, on the winding up of their affairs, were largely indebted to Havens, who was insolvent.

In August and October, 1838, the Dry Dock Company recovered a judgment against Wetmore & Havens. This was assigned in 1840 to Arthurs and Nicholson, who, in the same year, issued an execution, and, on the 24th August, purchased the land in question at a sheriff's sale.

The defendant deduced title from Patterson under a judgment against him in 1844, a sheriff's sale to Miller for $4, and a conveyance to defendant by Miller for $11—the value of the property being about $5000 or $6000. At the time of the sale to Miller,

notice was given of the title of the plaintiffs; and there was pretty strong evidence that Kramer was affected with notice of the adverse title.

It will, therefore, be perceived that Havens was the holder of the equitable title under articles, and that the trust for the partnership purposes was unrecorded, and that, on the settlement of its affairs, he was the creditor of the firm as agent and partner. Whether a judgment against him bound his interest as against a purchaser from him before the settlement of the affairs of the partnership, appeared to be the question.

The court (LOWRIE, J.) instructed the jury that Luckey's ratification of the unauthorized contract made by Lee had a retroactive effect, and vested the title under that agreement. Hence, when he conveyed to Patterson in pursuance of the contract between Patterson and Havens, the title vested under the contract with Wetmore in 1836, and the judgment against Wetmore and Havens attached upon that title. This judgment might be considered as restricted to that part of the property which remained in Havens after satisfaction of Luckey's claim for unpaid purchase-money, which had been satisfied out of the proceeds of sale of the other part of the land. The question then was, what was the title of Havens? This, the court said, was absolute as to all the world, except as between Havens and the land company. Being entitled to possession and control under the articles with the company until repaid all his advances, and being a large creditor of the company, he had such an interest as was bound by the judgment, and the plaintiff purchasing under that judgment was entitled to hold the land at least until repayment of Havens's advances by the company. There was no doubt that Patterson had notice of Havens's title, and hence purchased, subject to the judgment on his interest; and, as to those purchasing from Patterson, it seemed clear they had actual notice, or the conveyance was a device to avoid that difficulty. Whether Kramer had such notice, was for the jury to determine.

*Williams* and *Dunlop*, for plaintiff in error, argued that the ratification by Luckey could not affect any intervening rights, nor could they be let in on the estate thereby confirmed: McKinney v. Rhoads, 5 Watts, 345. There being no contract binding upon the vendor under the statute of frauds until the ratification, the judgment was not let in. The possession of Wetmore and Havens was not such as sufficed to take the case out of the statute; 1 Fonb.

Eq. 185; Anderson v. Maltby, 2 Ves. jun. 244; Whitbread v. Brockhurst, 1 B. C. C. R. 404. There was, therefore, no *estate* in Wetmore or Havens, which is essential to give a lien: Rickert v. Madeira, 1 Rawle, 329; but a sort of equitable right which never passed into estate until the conveyance to Patterson by Luckey. That there may exist such an equity, in Pennsylvania at least, is shown by Fisher v. Taylor, 2 Rawle, 33, and Vaux v. Parke, 7 Watts & Serg. 19. But what interest had Wetmore and Havens, supposing a title was vested in them? It was but a trust of an equitable title. Their title as trustee could not be sold, Frazer v. Hallowell, 1 Binn. 126; and the rights of their *cestuis que trust* were protected by the outstanding legal estate which they were entitled to manage; and, as to their right to a part of the profits, or their lien for advances, that cannot, in Pennsylvania, be said to be an estate, when we hold that the devisee of the proceeds of land has no such interest as can be sold under a judgment.

*Metcalf* and *Loomis*, contrà, argued that the ratification of the contract by Luckey had a retroactive effect to vest a title under the agreement: Story on Agency, ss. 244, 250, and 252. Under that agreement, a clear equitable estate was vested in the purchasers. This title, though equitable, was bound by judgment, which could not be defeated by any secret agreements of the holders; and, supposing it was subject to the articles, and converted into partnership stock, yet, as Havens was the creditor of the firm, he was entitled to the assets, and the plaintiffs succeeded to his rights, and could retain possession until his claims were paid.

*Nov.* 25. GIBSON, C. J.—In order to develope the principles of this case, it is necessary to state succinctly the facts to which they are to be applied. By the style of the Pittsburgh Land Company, the firm of Wetmore and Havens, and nineteen other shareholders, executed articles to constitute themselves a joint-stock company to deal in real estate in that city and its vicinity, which was limited, in its duration, to a period of three years; at the end of which, the investment was to be withdrawn and the profits divided. The capital stock was limited to $100,000, in shares of $5000—one of which was subscribed by Havens and Baldwin, who was one of the nineteen partners, and H. Wetmore and Havens were to be the active agents of the company and the ostensible owners of its property, having power to deal to thrice

the extent of its capital, and to take conveyances in their own names as the only persons concerned, but being bound, at the same time, to execute declarations of trust for the security of the company, and put them on record when required to do so. Besides Havens's proportion, as part owner of a share, Wetmore and Havens were to receive a third of the profits at the winding up of the concern; but, in every thing else, they were to be a mere conduit-pipe of the title from their vendors to their vendees. They purchased the ground in contest by a written agreement from Lee, holding himself out to be the agent of Luckey, the owner of it, who subsequently ratified the bargain in a written correspondence with Havens. Shortly afterwards, Wetmore retired from the company, transferring his interest to his partner Havens, who, with its assent, thenceforth became its exclusive instrument. Thus constituted, and having paid the purchase-money, he sold the premises to Stewart, by whose direction the title was made to Patterson —not, however, through Havens, *but directly from Luckey*. It will be seen that this avoidance of circuity is the master-key of the case. In the mean time—that is, between the bargain with Lee, and the execution of it by the conveyance from Luckey to Patterson—the Dry Dock Company of New York had obtained a judgment against Wetmore and Havens for a debt separately due by their firm, on which the premises were sold to the plaintiffs below; and we are first to inquire into the relation which they thenceforward bore to the defendant, or those from whom he derives title.

Had the legal title and consequent indices of ownership been in Wetmore and Havens at the time of the sheriff's sale, the plaintiffs, paying their money in ignorance of the defendants or the company's interest, would have been entitled to the character of purchasers without notice. The case would have fallen within the principle of Hale *v.* Henrie, 2 Watts, 145, in which it was ruled that partners, who bring real estate into the joint stock, can do so, as to strangers, only by manifesting their design in a paper registered in the recorder's office; else they will be mere tenants in common, and their estates in it will be severally liable for their separate debts. But, in the case at bar, the legal title was neither bound nor sold, for it never was in the debtors; and, without gross supineness, the purchasers could not have been deceived as to the quality of their estate or the extent of their interest. No rule is sounder or more imperative than that the purchaser of an inchoate or imperfect title, intimating, as it does, that something is kept back, must stand or fall by it as it existed in the hands of his

vendor. But the interest of Wetmore and Havens was not even the counterfeit presentment of a title; and, as it had the outward and visible sign of inward and utter vacuity, the plaintiffs, purchasing it for what it was worth, took no more than was in their debtors. On the other hand, Patterson, having acquired the beneficial interest of the company, had procured the legal title from the company's vendor; so that the defendant, deriving title from Patterson, has thus been put in the company's place. The parties, therefore, stood before the court below, as if Havens were pressing his supposed equity against the company's equity, backed by the legal title. What, then, would be the nature of his equity?

Before we proceed to inquire into that, it is proper to say that I am not called upon by the exigencies of the case to determine how far the defendant is protected, as an innocent purchaser of the legal estate, from Hampton and Miller, who had purchased it on a judgment from Patterson; or, to remark further on the subject, than that particular reflections in the charge seem scarce to have been warranted by the occasion. Nor is it necessary to determine whether the bargain with Lee was originally within the statute of frauds, or whether Luckey's ratification of it related to a time so far back as to have set it up as an existing contract at the date of the Dry Dock Company's judgment, under which the plaintiffs purchased. For the purposes of the decision, it may be admitted that an interest of some sort was vested in Havens by the ratification; but what was it?

That an incorporated joint-stock company is an ordinary partnership, and that there may be a partnership to deal in lands, are elementary principles that have not been disputed. The latter was expressly recognised by this court in Brady *v.* Colhoun's Administrators, 1 Penna. Rep. 147. "Partnerships," says Gow on Partnership, 6, "are not necessarily confined to trades in commercial adventures. They may lawfully exist in cases unconnected with commercial speculations. For instance, a partnership may exist between attorneys or farmers, as well as between merchants or bankers." It would be absurd to let the nature of the article dealt in change the nature of the contract; or not to let partners give to land the attributes of a commodity, as between themselves and those standing in their place, especially in a country where it is a chattel for payment of debts, and not unfrequently a subject of speculation. Where it is brought into a concern as stock, it is, as between the partners and a person who has knowingly dealt with one of them for it, to be treated as personal

estate belonging, not to the partners individually, but to the company collectively. The members of this company, being sharers of profit and loss, were partners to the world; but, between themselves, they had only a contingent interest in the profits to be derived from the lands when the concern should be wound up, not a vested estate as tenants in common of the lands themselves; and, to a purchaser with notice or its equivalent, neither of them could part with more, either by a voluntary or an involuntary conveyance. As an agent entitled to a third of the profits in compensation of his services, it cannot be said that Havens had any property at all in the corpus of the stock; and as to him, or a purchaser from him with notice, or the means of it, the joint creditors would have been entitled to priority of satisfaction without aid from the special provisions in the articles. But even if his title as a shareholder had given him a several estate in the land, it would have given him no more than an undivided twentieth part of each tract, and no more could have been sold on a judgment against him by a separate creditor; certainly not the entire tract, as was done here. But the lands constituted the stock, and, so far as Havens, or his alienees, with the means of notice, are concerned, they are to be treated as a commodity, as well by the express provisions of the articles as by the implied conditions of the contract. By these, it was stipulated that the estate on hand should be sold at the expiration of the partnership, and that the cash and securities, after payment of the debts, should be divided among the shareholders "*pro rata,* according to their respective shares of the stock." Now, what was the nature of the shares in the mean time? Havens did not own even a twentieth part of the land jointly or severally. In Allison *v.* Wilson's Executors, 13 Serg. & Rawle, 330, and Morrow *v.* Brenizer, 2 Rawle, 188, it was ruled that, where a party is entitled merely to the proceeds of land when sold, he has no estate in the realty which can be bound by a judgment, or sold on an execution against him. The present is a stronger case; for so to interpret such a contract as to allow each member of the company to have a specific interest in the lands which might be clogged by the liens or attachment of his separate creditors, would defeat the very end of the association. I grant that a sale on a judgment against the company by a partnership creditor, would pass its lands, no matter whether as such or as chattels; but by no device can a separate creditor of a partner take any part of his share out of the capital stock and apply it to the satisfaction of his debt, or sell any thing but his contingent share of the pro-

fits and stock at the settlement of the partnership account; and, as that is personalty, it cannot be bound by a judgment. A glance at the facts of the case will show an attempt by the plain-tiffs to do so at the expense of a party standing in the place of the company; and it must not succeed.

Judgment reversed.