# Moss's Appeal.   Lazarus's Estate.

1. A corporation having a surplus of earnings, increased its capital stock, and the privilege was given each stockholder to subscribe, at par, for as many shares of the new stock as he held of the old. The executors of an estate, which owned one hundred shares of this stock, having sold sixty of these options, with the sum realized therefrom, purchased forty shares of stock. *Held*, that these forty shares were capital and not income, and therefore did not go to the widow, who was entitled, under the will of decedent, to the income, profits and products of his estate for life, but belonged to the residuary legatees, to whom the capital was to descend after the widow's death.

2. Earp's Appeal, 4 Casey 368, and Wiltbank's Appeal, 14 P. F. Smith 256, distinguished.

[Moss's Appeal.]

January 12th 1877.  Before AGNEW, C. J., SHARSWOOD, MER-
CUR, GORDON, PAXSON and WOODWARD, JJ.  WILLIAMS, J., absent.

Appeal from the Orphans' Court of *Philadelphia county* :  Of
July Term 1876, No. 101.

This was the appeal of William Moss, M. D., and others, who
were the residuary legatees of the estate of Henry Lazarus,
deceased, from a decree of distribution in the account of Lucien
Moss, an executor and trustee under the will of decedent.

Deceased died in 1868, possessed of one hundred shares of the
stock of the Pennsylvania Company for Insurances on Lives and
Granting Annuities.  The executors did not sell this stock.  By
Act of April 3d 1872, Pamph. L. 790, the legislature authorized
said company to increase their capital stock by the issue of new
stock, not exceeding a million of dollars.  The stockholders of
said company, on March 31st 1873, accepted said act, and directed
the issue of ten thousand new shares, of $100 each, and gave to
every stockholder the right to purchase, at that price, as many of
the new shares as he held of the old.

Henry Lazarus's executors were entitled to subscribe for one
hundred shares.  They sold their right to subscribe to sixty shares
for $66.66 per share, making $4000, and with this sum purchased
forty shares, balance of that for which the executors were entitled
to subscribe.

Before an auditor, the widow, to whom the decedent had devised
the income, profits and product of his estate for life, claimed these
forty shares as income and profits; while the residuary legatees, to
whom the principal of the estate was to go after the widow's death,
claimed them as a part of the corpus of the estate.

The rest of the material facts will be found fully stated in the
opinion of this court.

The following adjudication was made by Dwight, J., who audited
the account :—

"The trustees purchased forty additional shares of the Pennsyl-
vania Company for Insurances on Lives, &c., with the money raised
by selling out the right to subscribe to sixty other shares.  At the
time the hundred shares already owned by the trustees

were worth . . . . . . . . $24,000

The one hundred and forty were at the time of audit
selling for $225, . . . . . . . 31,500
_____

Being net profits of . . . . . $7,500

"Under Earp's Appeal, 4 Casey 368, Wiltbank's Appeal, 14 P. F.
Smith 256, I think the *cestui que trust*, by virtue of the will, is enti-
tled to this profit.  I award to her thirty-three shares of the stock."

Exceptions were filed to this adjudication by both the residuary
legatees and Mrs. Lazarus, who claimed that the entire forty shares

should have been awarded to her. The court, in a decree entered *pro forma*, dismissed these exceptions and confirmed the adjudication.

From this decree the residuary legatees and Mrs. Lazarus each appealed.

*John Samuel* and *John G. Johnson*, for appellants, Dr. Moss and others.—The forty shares in question are capital, not income. Before the acceptance of the Act of 1872, if all the property had then been divided among the shareholders, the holder of every one share would have received $240 for it; or if at that time the executors of H. Lazarus had sold the stock, his estate would have received $240 for every share it held, equal to $24,000. The effect of the new issue doubled the number of the shares into which the assets were divisible, but did not double the assets to be divided. The divisor is doubled, but the dividend is not doubled; therefore the quotient, which is the value of the stock, is diminished.

To   10,000   shares, worth  $2,400,000, each share = $240, were
added  10,000   shares, worth   1,000,000

Result 20,000 shares, worth $3,400,000, each share = $170.

The one hundred shares belonging to appellants (subject to life estate), after the new issue, were worth $17,000 instead of $24,000. When, therefore, the executors bought the forty new shares,

worth $170,   .   .   .   .   .   .   .   .   .   $6,800
And added them to the one hundred old shares on hand,
worth $170,   .   .   .   .   .   .   .   .   17,000

The result was one hundred and forty shares, worth   .   $23,800

The sum of money, therefore, at which the options were sold, viz., $4000, which, by investment, became the forty shares in question, was precisely the difference required to maintain in its integrity the one hundred shares left by Henry Lazarus. In Atkins *v.* Ambree, 12 Allen 361, the value of the right to take new shares was held to go to the remainderman, not to the life-tenant, the court saying: "The right or privilege to take new shares in a corporation, upon an increase of the capital stock within the limits fixed by the charter, is a benefit or interest which attaches to stock, not as profit or income derived from the prosecution of the corporate business, but is inherent in the shares from the very creation."

Even if the sum of $1,400,000 beyond the original capital of $1,000,000, which went to make the value of Henry Lazarus's one hundred shares $240 each, was accumulated profits of the company, these were in no sense the property of Mary Lazarus, for they never had been divided by the company or distributed in the shape of profits or income. The company alone has the right to say whether they will retain any of its earnings for the exigencies of

its business, or distribute them as dividends.　Until such a distribution is made, the earnings are capital of the shareholders, not income: Ezekiel Barton's Trust, Law Rep. 5 Eq. 238; Straker v. Wilson, 6 Law Rep. Ch. App. 503.

Earp's Appeal and Wiltbank's Appeal are to be distinguished from this case.　In the former there was an actual distribution of profits—*qua* profits—in the shape of dividends.　It was distributed among the stockholders in the form of new certificates, the recipients not paying anything.　In the latter, there was no evidence of a loss to the remaindermen, as here; and being in opposition to every American or English case, it should be restricted to its letter.

The adjudication of the court below, in fixing the value of the shares at the date of the audit, is clearly wrong.　This would be to make the estate of the life-tenant and the remaindermen to depend on the time when the executors filed their account or the dilatoriness or precipitancy of the court in auditing the account.

*Samuel Gustine Thompson*, for Mrs. Lazarus.—It is manifest that the testator intended that his wife should have all that should grow out of his estate, whether it was in the nature of income, product or profit.　He not only bequeaths the income, but significantly adds "profits and products."

The options sprang from the old stock and were literally their product.　Wiltbank's Appeal settles beyond question that the right to subscribe given to the old stock is a product of such stock and the sum realized from it is a profit and therefore income.

While Earp's Appeal differs from Wiltbank's Appeal, in the facts, they both establish, that where there is gain or profit, either in certificates of stock or money, either directly from, or as an incident to stock, it is income.

The court erred in awarding but thirty-three of these shares to Mrs. Lazarus.　They should have awarded the entire forty claimed by her.

Mr. Justice PAXSON delivered the opinion of the court, January 22d 1877.

Henry Lazarus, by his will, devised "the income, profits and products" of his estate to his wife for life, and after her death (after the payment of certain legacies) he devised all of his estate to residuary legatees, among whom are the appellants.　At the time of his death in 1868, he was the owner of one hundred shares of the capital stock of the Pennsylvania Company for Insurance on Lives and Granting Annuities.　The stock of said corporation consisted of ten thousand shares of $100 each, amounting to $1,000,000.　The executors did not sell this stock, but retained it in their hands as a part of the residuary estate.　An Act of Assembly was passed in 1872, authorizing said company to increase its capital stock by the

issue of new stock not exceeding $1,000,000. In March 1873, the company accepted this act, and proceeded to issue ten thousand shares of $100 each, thus doubling the original capital. To each of the old stockholders was given the privilege of subscribing and paying for as many shares of the new stock as he or she held of the old. The estate of Henry Lazarus thus became entitled to subscribe for one hundred shares of the new stock. At that time the old stock was worth, in the market, $240 per share, which valuation was based upon actual cash assets in the hands of the company, there being an admitted surplus of $1,400,000 over and above the $1,000,000 originally paid in. In May and June 1873 the market price or option to subscribe for shares was $66 each. The executors of Henry Lazarus having no funds on hand to subscribe for the one hundred new shares to which his estate was entitled, sold the option or right to subscribe for sixty of them for $66⅔ each, realizing the sum of $4000 therefrom, and with this money they subscribed and paid for the remainder, to wit, forty shares. Mary Lazarus, the widow, claims these forty shares as income. The residuary legatees claim them as a portion of the *corpus* of the estate devised to them. The Orphans' Court, under the authority of Earp's Appeal, 4 Casey 368, and Wiltbank's Appeal, 14 P. F. Smith 256, awarded thirty-three of said shares to the widow as income or profits. From this decision both parties entered an appeal to this court; the widow alleging that she was entitled to the whole of the forty shares; the remaindermen alleging that she was not entitled to any of them. Whether she is entitled to the whole or any portion of the forty shares is the sole question presented by this record.

We are in no doubt about the law. That can be ascertained with mathematical precision. The difficulty is in applying the principles of law, however well settled, to the facts of a particular case. Herein we think the learned judge of the Orphans' Court fell into error. This case differs widely from either Earp's Appeal or Wiltbank's Appeal. In Earp's Appeal, the testator at the time of his death in 1848, held five hundred and eighty shares of the stock of the Lehigh Crane Iron Works, of the value of $125 per share. This stock formed a part of the residuary estate of the testator, and was bequeathed to his executors in trust to pay the income thereof to his four children during life, with remainder over. For several years after the death of the testator the company had made large profits. Upon the first day of July 1854, the actual surplus earnings of the company, as ascertained by the report of the master, amounted to the sum of $714,542.15. On the 10th of July 1854, under authority of an amendment to its charter, the company proceeded to make distribution of a portion of this accumulated profit, by increasing its capital stock from $200,000 to $500,000. This increase was represented by six thousand new shares at $50 each, apportioned among the then stockholders, and paid for entirely out of the sur-

plus earnings or profits of the company.  The five hundred and forty shares held by the estate of Robert Earp, received eight hundred and ten of the additional shares, making altogether one thousand three hundred and fifty shares.  The contention was whether the eight hundred and ten shares should be regarded as principal, and as such remain in the hands of the executors, or whether they should be regarded as income, and go to the life-tenant.  After the increase of stock the shares fell from $125 to $80 per share.  The decree of the court below, affirmed by this court, awarded a portion of the new shares to the life-tenant as income.  But an examination of the decree shows that the court was careful to award to the executors enough of the new stock to make up the deficiency in value of the original five hundred and forty shares caused by the issue of the new, thus preserving the integrity of the capital to the remaindermen.

This case was exceptional in its character.  As a general rule, nothing earned by a corporation can be regarded as profits, until it shall have been declared to be so by the corporation itself, acting by its board of managers.  The fact that a dollar has been earned gives no stockholder the right to claim it until the corporation decides to distribute it as profit.  The wisdom of such distribution must of necessity rest with the corporation itself.  From motives of prudence and self-interest it is frequently desirable to add all or a portion of the earnings to the capital.  This is sometimes necessary as a basis of credit for more enlarged operations.  It is often a wise exercise of discretion for a corporation to strengthen itself in this way, and with such discretion a stockholder cannot interfere.  His only remedy is by an appeal to the ballot at the election for directors.  But where a corporation, having actually made profits, proceeds to distribute such profits amongst the stockholders, the tenant for life would be entitled to receive them, and this without regard to the form of the transaction.  Equity, which disregards form and grasps the substance, would award the thing distributed, whether stock or moneys, to whomsoever was entitled to the profits.  This is all that was done in Earp's Appeal.  The profits had accumulated until they reached nearly three-quarters of a million dollars.  A considerable portion of this surplus was distributed to the stockholders in the shape of new stock.  It was confessedly profits.  It was judicially ascertained to be profits after a careful examination and report by the master.  The corporation recognised the transaction as a distribution of profits.  The present case differs from Earp's Appeal in this, that the corporation had made no distribution of profits in the shape of stock or otherwise, other than its regular dividends.  In Earp's Appeal the stockholder paid the company nothing for the new stock.  It was paid for wholly out of the profits.  Here the stock of the company was merely doubled in amount, the stockholders paying therefor its par value in cash.

Wiltbank's Appeal was a different case and stands upon its own peculiar facts. Without going into the details of that case, it is sufficient to say that the trustees sold the new stock and realized an actual profit, which was carried to the trust account.

There was also the further significant fact stated in the opinion of the court, that there had been no serious diminution of the value of the old stock caused by the new issue. Here, then, was the case of the capital remaining unimpaired for the remaindermen, and an actual, realized profit by the sale of the new shares. Such profit was properly awarded to the life-tenant. No such state of facts exists here. It requires but a cursory examination of this transaction to show that no profit has been made except upon paper. As before observed, the corporation had declared no profits and distributed none. It merely allowed the holder of each share of the old stock to subscribe for a corresponding share of new stock, and to pay to the company the par value thereof. This right or option was worth from sixty to seventy dollars per share. The executors sold the option for sixty shares and with the proceeds bought and paid for forty shares of the new stock. The latter is said to be profit. It looks like profit and might readily be mistaken for it. That it is not, is conclusively shown by the facts as found by the learned judge of the court below. He says: " In January 1873, the stock sold for $240 per share. In July 1873, it sold for $170 a share. The result on the shares, after the option to subscribe, was to add to the assets $1,000,000, and ten thousand new shares. The stock was doubled; most of the options were sold in May and June. They then went down to $66 for each option to subscribe. The largest number was sold at that price. If a stockholder sold his option to subscribe at $70 each he was just even, and if at less than $70, he lost." It thus appears that for each dollar gained by the sale of the options, a corresponding dollar was taken from the value of the original shares. If the company had gone into liquidation the day before the issue of the new stock, the one hundred shares of original stock would have realized $24,000. If it had gone into liquidation the day after, the one hundred and forty shares would have realized the same sum. Where then was the profit? It was figured out by the court below in this wise:—

| | |
|---|---:|
| The original one hundred shares were worth | $24,000 |
| The one hundred and forty shares, market price at the time of the audit, $225, were worth | 31,500 |
| Being net profits of | $7,500 |

The fallacy of this theory consists in the fact of estimating the one hundred and forty shares, not at their actual value at the time of the transaction, but at their market value, three years after-

[Moss's Appeal.]

wards.   A more uncertain rule could not well be imagined.   It would make the rights of the parties depend upon the condition of the stock market, which is as variable as the tides, without their regularity.   Market values are well enough upon a question of distribution, where the parties are about to realize; but upon a question of values between life-tenants and remaindermen, a judicial decree should go down through the shifting sands of the stock market until it reaches the solid rock of actual values.   The application of any other rule might work serious injustice.   It is well known that within the last year the stock of more than one large corporation has varied in price over one hundred per cent.   Even if the market value were a proper test, why take it three years after the transaction occurred?   Why not one year, two years, or any other time?   The tenant for life and remaindermen might well differ as to the precise day which should fix the market value, as the bulls or the bears might happen to be in the ascendant.   It often happens that stocks that are intrinsically worthless are kept up at high prices by the ways that are peculiar to Third street and Wall street.   In such a case as this, the solemn judgment of a court upon a question of values, defining the rights of parties in the future, must have a more secure foundation.   The date at which the value of this stock must be estimated is the time when the transaction took place.   Its actual value then was $170 per share.   This valuation is based, not upon the caprice of the market, but upon actual assets in the hands of the company.   If it was worth $225 per share in 1876, when this account was audited, the increase is the result of the gains of the business of the company during the preceding three years; as such it forms a portion of the capital of the company, and so must remain until such time as said company shall declare it to be profit and in some manner provide for its distribution.   When such event shall occur, the one hundred and forty shares will be entitled to their proportion thereof.

We are of opinion that the forty shares of new stock issued by the company form a portion of the capital of the residuary estate of Henry Lazarus, deceased, and must be held upon the same uses and trusts as are expressed in the will of the testator in regard to the original one hundred shares of the same stock.

> The decree is reversed, and the record remitted to the Orphans' Court for further proceedings in accordance with the views contained in this opinion; the costs of the appeal to be paid by the appellee.