On December 5, 1888, the first account of James B. Chandler and Catherine M. Richardson, as trustees under the will of George L. Oliver, deceased,* wherein the accountants charged themselves with principal amounting to $612,822.21, and with income amounting to $151,139.02, was called for audit before HANNA, P. J., who afterwards filed an adjudication, finding the following facts:
The account was conceded to be correct, except in the single particular hereinafter referred to, and the assets, being securities *Page 45 
and investments of the estate, in the custody of the trustees, and belonging to the corpus of the trust estate, were found to be in their possession and custody, as set forth in the account.
The annexed is the first account of the trustees, their account as executors having been heretofore filed, audited and confirmed by the court, and the balance of principal of the estate was awarded to them as trustees under the will of testator.
Among the securities and investments thus awarded to the accountants, and which were the property of testator in his lifetime, are 5,582 shares of stock in the Metalline Land Company, appraised for the purposes of the inventory and appraisement at the sum of $5; not $5 per share, but $5 for the whole number of shares. The single question now for determination arises from this investment by testator. And it should here be stated that the entire number of shares is still in the hands of the trustees.
On November 3, 1883, the trustees received from the Metalline Land Company, a dividend of $19.50 per share, amounting to the large sum of$ 108,849, and with which they charge themselves in their annexed "Income Account."
At the hearing before the auditing judge, Messrs. Henry and Junkin, for the Merchants' Fund Association, claimed that said sum of $108,849 was improperly included by the trustees in their account as income, and that it should be stricken therefrom and transferred to the principal account, for the reason that it did not represent income, but principal of the estate. This was objected to by Messrs. Dale and Olmsted, who contended that said sum was strictly dividends and profits, and therefore properly included in the income account. Thus, the single question in dispute is presented.
In order to arrive at a correct determination, it is necessary to refer to certain facts appearing from the evidence before the auditing judge.
George L. Oliver, the testator, died June 3, 1886. On December 15, 1862, he with three other persons entered into articles of agreement bearing that date, whereby they" agreed to associate themselves together under the name of the Metalline Land Company of Lake Superior, for the purpose of purchasing lands, and developing mines of copper and other valuable minerals and disposing of the same."" And in order more *Page 46 
effectually and advantageously to manage the property and improve and make sales thereof, and to prosecute the business of said company, the parties hereto severally and individually. . . . agree each with the other that the following shall be the articles of mutual agreement and association forever binding upon each of the said parties. . . . while they are stockholders in the company."
By article 2 of this agreement, it was provided that, "the property of the company shall be divided into twenty thousand shares of five dollars each, each of which shall entitle the proprietor to one undivided twenty thousandth part of all property which now belongs to or may hereafter be acquired by the company, or which may hereafter be in any way held by the trustees hereafter named, or their successors in said trust, for the use and benefit of the said company." Of the 20,000 shares, into which the capital stock of the company was divided, Mr. Oliver subscribed for 3,900 shares, but afterwards became the owner of additional shares, so that at his death he owned, as stated, 5,582 shares.
The articles of association also provided that" the shares of the company shall be issued to the proprietors of the lands, in proportion to their respective interests in said lands, liable to no more than five dollars per share assessment, and the board of trustees shall have authority to make a requisition upon their several stockholders for the payment of such instalments upon the shares held by them, whenever they may deem it necessary or expedient," etc. And by article 5, it is provided that," the funds and property of this association shall be vested in three trustees, to be held by them as joint tenants,. . . . and no person shall be a trustee who is not a stockholder in the company." By article 6, it is, inter alia, provided that an annual meeting of the company shall be held, other meetings shall be called, and each stockholder shall be entitled to one vote for every share held by him, etc. By article 8, it is provided that the trustees "shall have the entire control and disposal of the property of the company, both real estate and personal; make such purchases, conveyances, sales or contracts, and expend all moneys, and dispose of all other property in such way as they may deem for the interest of the company," etc. They are also authorized" to execute and deliver *Page 47 
warranty, mortgage, or other deeds. . . .of all or any portion of the property held by the company, in such ways. . . . as they shall judge best calculated to promote the objects of the company and advance the interests of the stockholders. They shall make such improvements and explorations of the lands of the company as they may deem expedient, in order to develop their value and facilitate their sale," etc. By article 9, the trustees are authorized "from time to time (to) declare and pay out dividends of profits to the several stockholders." Article 10 prescribes the form of certificate to which every stockholder is entitled, certifying his property in the shares expressed by the certificate. And, by article 11, it is provided that "this company may at any time become incorporated, whenever it shall be so determined by a vote at a regular meeting of the stockholders, at which a majority in interest are present," etc.
The company, however, never was incorporated, and still continues to transact its business through trustees, as provided in said articles of association. It also appeared that the individuals who became party to said articles of association and agreed to form said company, did not pay or contribute the sum of $5 per share for each share of stock subscribed by them, but only the sum of $1.90 per share. This was paid in six instalments or assessments called in between March 22, 1864, and May 24, 1881, and the sum of $38,000 thus realized constituted the entire working capital of the company.
The first purchase of land by the trustees was early in 1864, when they purchased 1,200 acres of land in Michigan, which were valued at $25,000, and the first instalment of $1.25 per share was then called in. They soon began to sell land and make other purchases, and acquired in all between ten and eleven thousand acres. Between 1864 and 1882 they sold nearly 10,000 acres, and had remaining 600 acres. It appeared that the sales were made partly for cash, and partly in stock of the mining companies purchasing the lands; so that when the trustees declared the first dividend on March 22, 1864, it was $1.25 in cash and five shares of the Reliance Mining Company's stock to each ten shares of the Metalline Land Company's stock, and six shares of the Vulcan Mining Company's stock to each ten shares of the Metalline Land Company's stock. *Page 48 
The next dividend was on May 1, 1865, of fifty cents in cash per share. The trustees, however, continued to make sales of the lands of the company, but declared no further dividends.
At the death of testator in June, 1886, the trustees still held unsold, as stated, 600 acres of land. By reason of developments upon the lands adjoining those held by the trustees and which formerly belonged to them, it became the opinion of mining experts that the lands still held by the trustees contained deposits of copper ore of immense value. A great excitement ensued, and producers of copper, and investors, and speculators in copper-mining stocks, became convinced of the existence of mines of untold wealth buried in the lands of the Metalline Land Company. These lands immediately appreciated in value beyond the most sanguine expectations of the trustees, and in October, 1888, they sold to the Calumet and Hecla Mining Company 40 acres, for the sum of $500,000 in cash, or $12,500 per acre. And they still have on hand 560 acres, whose value is unknown and cannot be determined except by actual sales.
On November 2, 1888, the trustees held a meeting, and, by advice of counsel, declared a dividend of $19.50 per share to the holders of the stock of the Metalline Land Company. And thus the present accountants received the sum of $108,849, with which they charge themselves asincome belonging to the trust estate.
In pursuance of the will of testator, and by reason of the death of her husband, Mrs. Catherine M. Richardson, daughter of testator, is entitled during life to "all the net rents, issues, profits, and income of the remainder and residue of my estate, real, personal, and mixed, of which I may die seised." And by the succeeding item of his will, testator gave, devised, and bequeathed "the principal of the said residue and remainder of my estate," after the deaths of his daughter and her hus band, to the Merchants' Fund Association, for a perpetual fund, to be called the Oliver Fund, the income of which fund shall he used for providing, or assisting to provide, comfortable homes and support for indigent and infirm old merchants of Philadelphia. . . .
— Upon the facts above stated, the auditing judge, citing Kramer v. Arthurs, 7 Pa. 165; Morrow v. Brenizer, 2 R. 188; *Page 49 
Allison v. Wilson, 13 S. R. 330; Bridge Co. v. Commonwealth,117 Pa. 265; Vinton's App., 99 Pa. 434; Biddle's App., 99 Pa. 278; Moss's App.,83 Pa. 264, found, as a conclusion of law, that the dividend of $108,849, received by the accountants from the Metalline Land Co., was income, and awarded the same to Mrs. Catherine M. Richardson, as legatee for life.
Exceptions to the adjudication, filed by the Merchants' Fund Association of Philadelphia, having been argued before the court in bane, were dismissed on March 2, 1889, opinion by FERGUSON, J.:**
It seems to be settled as the law of this state that the surplus earnings of a corporation, which have accumulated in the lifetime of the testator but which were not divided until after his death, belong to the corpus of his estate; but that dividends declared, which have been actually earned since the death of the testator, belong to the income and are payable to the lifetenant, no matter whether such dividends are in cash, stock or scrip. The test seems to be, that what has been earned, accumulated, and actually existing in the lifetime of the testator, is principal, but what is earned after his death is income: Earp's App., 28 Pa. 368; Moss's App., 83 Pa. 264; Biddle's App.,99 Pa. 278: Wiltbank's App., 64 Pa. 256; Thomson's Est., 11 W. N. 482, and Phila. Trust Co.'s App., 1 Mona. 230. As was said by PAXSON, J., in Moss's App., 83 Pa. 264," We are in no doubt about the law; that can be ascertained with mathematical precision. The difficulty is in applying the principles of law, however well settled, to the facts of a particular case." This case furnishes an illustration of this difficulty.
When this testator died there came into the hands of his executors and trustees 5,582 shares of stock in the Metalline Land Company of Lake Superior, which were appraised at $5. This seems to have been all the value that was placed upon these shares by competent persons at that time.
This company had been formed by the testator and others in 1862, "for the purpose of purchasing lands and developing mines of copper and other valuable minerals, and disposing of the same." It was not incorporated; and, although it carried *Page 50 
on its business in much the same way as a corporation, it must be regarded as what it in fact was, a partnership. It was organized under articles of association, whereby the holding of the titles to the lands as joint tenants, the management of the business of buying and selling lands, and of declaring dividends upon the profits thereof, was vested in three trustees. The capital stock of the company was represented by 20,000 shares, divided among the several stockholders according to their respective interests. The total amount of capital paid in was $38,000.
This company did nothing in the way of developing mines, but confined its operations to speculating in lands; so that between the time of its organization and the year 1882, about 10,000 acres of land were bought and sold. These sales were made at different times to different purchasers, and out of the profits thereof dividends were declared and paid to the stockholders. At the time of the testator's death, 600 acres remained in the hands of the trustees undisposed of; and it does not appear that for a number of years before his death there had been much, if anything, done by the trustees, except keeping up the organization of the company and making assessments upon the stockholders for the purpose of paying expenses, taxes, etc. There had been no sales of land for some time.
This was the status of affairs at the time of the testator's death in June, 1886. Over two years afterward, as found by the auditing judge, "by reason of developments upon lands adjoining those held by the trustees, and which formerly belonged to them, it became the opinion of mining experts that the lands still held by the trustees contained deposits of copper ore of immense value. A great excitement ensued, and producers of copper, and investors, and speculators in copper-mining stock, became convinced of mines of untold wealth buried in the lands of the Metalline Land Company. These lands immediately appreciated in value beyond the most sanguine expectations of the trustees, and in October, 1888, they sold to the Calumet and Hecla Mining Company forty acres for the sum of $500,000 in cash, or $12,500 per acre." The trustees then passed a resolution declaring "a dividend out of the profits arising from the sale of land to the Calumet and Hecla Mining Company of $19.50 per share," and there was paid to the accountants on *Page 51 
the shares held by them $108,849. The trustees have still on hand, belonging to the company, 560 acres of land, and a large sum of money in cash greatly in excess of the capital, so that it was not impaired by this dividend. The testator by his will gave unto his daughter" all the net rents, issues, profits and income" of his estate, and the question raised is whether this dividend was principal or income. For the purpose of determining this question, let us first consider what were this company's objects and purposes, whether the business was one that was recognized by law, and what was the status of the several stockholders therein, with reference to the real estate held by it and the profits made by any sales thereof.
All these questions were settled by the Supreme Court in Kramer v. Arthurs, 7 Pa. 165, in the case of the Pittsburgh Land Company, which was an unincorporated company organized to deal in lands, as this was. Chief Justice GIBSON says:" That an incorporated joint-stock company is an ordinary partnership, and that there may be a partnership to deal in lands, are elementary principles that have not been disputed. The latter was expressly recognized by this court in Brady v. Colhoun, 1 P. W. 147. `Partnerships,' says Gow on Partnership, 6, `are not necessarily confined to trades in commercial adventures. They may lawfully exist in cases unconnected with commercial speculations. For instance, a partnership may exist between attorneys or farmers, as well as between merchants or bankers.' It would be absurd to let the nature of the article dealt in change the nature of the contract; or not to let partners give to land the attributes of a commodity, as between themselves and those standing in their places, especially in a country where it is a chattel for the payment of debts, and not unfrequently a subject of speculation. Where it is brought into a concern as stock, it is, as between the partners and a person who has knowingly dealt with one of them for it, to be treated as personal estate belonging, not to the partners individually, but to the `company collectively. The members of this company, being sharers of profit and loss, were partners to the world; but, between themselves, they had only a contingent interest in the profits to be derived from the lands when the concern should be wound up, not a vested estate as *Page 52 
tenants in common of the lands themselves; and, to a purchaser with notice or its equivalent, neither of them could part with more, either by a voluntary or involuntary conveyance."
The interest of the estate of George L. Oliver, then, was not a vested estate in the lands, but a contingent interest in the profits to be derived from them when sold. If this position is correct, then there is no force in the argument urged by the remaindermen, that as the copper in these lands was what made them valuable, and it existed at the time of the testator's death, the value was then there, and although its extent was not ascertained, its product must be regarded as part of the corpus of the estate.
The force of this argument is still more weakened when we consider that the intrinsic value of the land sold is not even ascertained to-day. The price at which it was sold was purely a speculative one, and based, perhaps, upon a fictitious valuation, resulting from the excitement incident to the supposed discovery of a valuable vein of copper ore. Time may yet develop the fact that there is no increased value in the land, or, if there is, it has been greatly over-estimated. There have been too many hundreds of thousands of dollars lost by people who have bought land, supposing that the bowels of the earth were filled with treasures of gold, silver, coal, etc., to conclude that in this case the value must necessarily be there because the consideration was paid for it. As it is uncertain to-day whether the value supposed to be in these lands exists, of course it is equally uncertain as to whether it existed at the time of the death of the testator; but, whether it existed or not can make no difference, for the interest of the testator therein was not in the lands, but in the prospective profits of a company dealing in them, in which company his interest was represented by the number of shares of stock which he held.
The next consideration is whether the phenomenal "profit" was earned since the death of the testator. Perhaps the fact that this profit is so extraordinarily large is the reason why we have this case to consider. If it had been an ordinary dividend upon these shares the right of the life-tenant thereto would not have been called in question, but the principles which govern must be the same, without regard to the amount. The general meaning of the word "earn" is "to acquire by labor, service or *Page 53 
performance: to deserve and receive as compensation; "and, whenever we use the word, it necessarily implies some labor or service for which the earnings are the reward. In this case, the company did nothing upon these lands after the death of the testator, and for a number of years prior thereto. In fact, it does not appear that it ever did anything but buy the land, pay the taxes as they fell due and payable, and wait for an opportunity to sell as customers offered. This seems to have been the object and purpose of the organization, to buy and sell lands; and, as it had abandoned the scheme of developing land for mining purposes, this, then, was the only way by which it could earn any profits for the shareholders.
Now, it so happened, that over two years after the testator's death, while the company was carrying this land in pursuance of the purposes of its organization, as just stated, by reason of a fortunate circumstance a purchaser was found for a small portion of it at an enormous price, and a large profit" was realized on these shares of stock, which at the time of the testator's death were appraised at a mere nominal sum. Now, when was this profit earned ? The profit was the fruit of the sale; and a sale for the purposes of profit was the object of the company's organization. It seems to us that the profit was earned when the sale was accomplished. There had been nothing done before that time to earn this profit, and all that was then done was the action of the trustees of this company in taking advantage of this speculative" boom" in copper mines, and then negotiating this very advantageous sale of a part of this land before the bubble would burst. The effecting of this sale is how the profit was earned, and as this took place long after the death of the testator, we think it is a profit which, under his will, belongs to his daughter.
The exceptions are dismissed and the adjudication confirmed. Thereupon the exceptant took this appeal, specifying that the court erred:
1. In awarding the dividend of $108,849 to Mrs. Catherine M. Richardson as income, and in not holding it to be principal, and awarding it as such to the trustees under the will.
 Mr. James Bayard Henry and Mr. George Junkin, for the appellant: *Page 54 
1. All that the court said about "excitement," "speculation," "boom," "intrinsic value," and "bubble" bursting, is unwarranted by any evidence in the case. There is nothing to justify the suggestion that the land sold was not really worth the sum which it brought. If it was, it had the same intrinsic value at the death of Mr. Oliver, and there has been no gain, income or profit made or earned since his death. It may, for the purpose of the argument, be conceded that the land company was simply a partnership; the opinion of the court below is based upon this assumption. But there is no authority that declares an appreciation in the value of the assets of a partnership, as they existed at the death of one of the partners, to be income which is to go to a life-tenant.
2. Nor is there any case holding that the whole of a decedent's interest in a partnership is not a part of the principal of his estate. There are exceptional cases, such as Heighe v. Littig, 63 Md. 301
(52 Am. Rep. 510); Ibbotson v. Elam, L. R. 1 Eq. 1881; but, beyond all controversy, such an interest is ordinarily principal. In all the exceptional cases the partnerships were, by their terms, to be continued irrespective of the death of a partner. No such provision exists in the present case. The death of Mr. Oliver dissolved the partnership, and no new business could thereafter be transacted. All that could be done was to sell the remaining assets and divide the proceeds, and the trustees of the partnership attempted to do nothing more. No profit, in the proper sense of the term, could be made, and any advance received upon sales of assets, is capital, not income.
3. All the assets existing at the death of the partner were capital, irrespective of whether more or less than their supposed value should be realized upon their subsequent sale. The argument of the learned judge, to show that the $108,849 was earned since the death of the testator, is unsound and fallacious. The company did nothing to earn it. The discovery by others, while it was in a comatose state, of the existence of minerals in this land, cannot be called an earning by the company after his death. And the gains realized by this sale are not the same as ordinary partnership gains. This is a case out of the ordinary. The life-tenant is not entitled to any portion of the capital or assets of the partnership, or the proceeds thereof: *Page 55 
Kinmonth v. Brigham, 5 Allen 276; Lewin on Trusts, 304; Williams on Executors, 1393; Hill on Trustees, 591.
4. If the land company had been in active operation, buying and selling lands and paying dividends, at the date of the testator's death, it might be said that he intended such dividends to be considered as part of his estate, as in Reed v. Head, 88 Mass. 174, and Balch v. Hallet, 76 Mass. 402. But, in the circumstances of the present ease, there can be no dividends, except dividends of capital. If the trustees of the company had undertaken to divide the land itself, the life-tenant would not have been given the fee in any portion of it, and yet the court has awarded her the proceeds of the sale of the fee. There is no magic in the words dividends, profits and income, and equity will disregard the form and grasp the substance of the transaction: Vinton's App., 99 Pa. 434; Eley's App., 103 Pa. 300; Earp's App., 28 Pa. 368; Moss's App., 83 Pa. 264.
5. There are gains of increment as well as gains of income or earnings: Bridge Co. v. Commonwealth, 117 Pa. 265. Income of a partnership association or corporation may be carried into capital account, and new stock, or its equivalent, may be issued therefor to the life-tenant; but increase in the value of assets belongs to the remainderman, especially when, as in this case, it arises from the discovery by strangers of unknown elements of value, and not from any efforts on the part of the management: Cook on Stocks and Stockholders, § 553; Perry on Trusts, § 545 and note; Hill on Trustees, 591; New England Trust Co. v. Eaton, 140 Mass. 532. The income or earnings which, under the Pennsylvania rule, belong to the life-tenant, must result from the employment of either capital or labor or both combined: Earp's App.,28 Pa. 368; Eley's App., 103 Pa. 300.
6. In this case, the fund was realized by a sale of part of the 600 acres of land of which the testator owned an undivided share. The proceeds of such a sale cannot go to the lifetenant: Cairns v. Chaubert, 9 Paige 160; Paris v. Paris, 10 Ves. 185; Howe v. Dartmouth, 7 Ves. 151; Hill on Trustees, 591; Perry on Trusts, § 545; Lewin on Trusts, *305; Cook on Stocks and Stockholders, § 554; Williams on Executors, 1393; Vinton's App., 99 Pa. 434; Heard v. Eldredge, 109 Mass. 258; Gifford v. Thompson, 115 Mass. 478; Van Doren *Page 56 
v. Olden, 19 N. J. 117. The life-tenant would not lose by any depreciation in the value of the principal, and neither can she gain an advantage by its appreciation, no matter how speculative and unreal the advance may be: Hubley's Est., 16 Phila. 327, affirmed by Supreme Court in January, 1884; Vinton's App., supra; New England Trust Co. v. Eaton,140 Mass. 552; In re Gerry, 103 N. Y. 445; Cairns v. Chaubert, supra; Hill on Trustees, 591.
Mr. Richard C. Dale and Mr. Henry C. Olmsted, for the appellee:
1. The appellant's argument rests upon the proposition that the testator was the owner of an undivided portion of the land sold. The fallacy in the reasoning by which that proposition is sought to be supported, is that it overlooks the well-established distinction between ordinary partnerships and unincorporated joint-stock associations, with shares transferable at the pleasure of the shareholder. Such an association is not dissolved by the death of a shareholder: Lindley on Partnership, 244. The forty acres were owned, not by individuals, but by a company, organized for the purpose of buying and selling lands for profit. The legal title was vested in the trustees of the company; the equitable title was in the association as a unit, the individual shareholders having no estate, legal or equitable, in the lands as such, their interests being solely in the proceeds of the lands when divided as profits, with a right to the return of the capital invested, upon liquidation: Kramer v. Arthurs, 7 Pa. 165.
2. There is no real distinction between incorporated and unincorporated associations in this respect: Andrews v. Schott,10 Pa. 50; Morrow v. Brenizer, 2 R. 188; Allison v. Wilson, 13 S. R. 330; Meily v. Wood, 71 Pa. 488; Zell's App., 126 Pa. 329. This case stands before the court in the same light as if the company had dealt in, and had sold, copper instead of land. It should require very clear affirmative evidence showing fraud in the declaration of this dividend as profits by the trustees, to overcome the effect of their action and justify the court in treating it as a division of capital in the guise of profits. There is not a scintilla of such evidence. It is argued, however, that the profit was earned in the testator's lifetime because the land was then owned by the company. But the *Page 57 
profit on such a transaction is made when the sale takes place. Moreover, at the testator's death there was no reason to believe that the land was worth its cost, and all the increase in their market value has come since.
3. It is undisputed that the company retains money and land far in excess of its capital, and on the undisputed facts, under a well-settled line of authorities, the life-tenant is entitled to the dividend, as a profit accruing during her ownership: Earp's App., 28 Pa. 368; Wiltbank's App., 64 Pa. 256; Thomson's Est., 11 W. N. 482; Phil. Trust Co.'s App., 24 W. N. 137 (1 Mona. 230); Bridge Co. v. Commonwealth,117 Pa. 265; Barclay v. Wainewright, 14 Ves. 66; Browne v. Collins, L. R. 12 Eq. 586; Hyatt v. Allen, 56 N. Y. 553 (15 Am. Rep. 449); Perry on Trusts, §§ 544, 545; Reed v. Head, 6 Allen 174; Harvard College v. Amory, 9 Pick. 446; Balch v. Hallet, 10 Gray 402; Van Doren v. Olden,19 N. J. Eq. 176; Lord v. Brooks, 52 N. H. 72. In Moss's App., 83 Pa. 264, and Biddle's App., 99 Pa. 278, the transaction was substantially an increase of capital stock, without an increase of capital, producing a consequent impairment of the value of the original shares, and the stock dividends were held to be capital for that reason. Vinton's App., 99 Pa. 434, is distinguishable from the present case, as substantially the entire capital was there distributed.
The contest in this case is between the life-tenant and the remainderman, and the question is whether the fund in the hands of the trustees is income or principal. It appears that George L. Oliver was one of the persons who organized the Metalline Land Company of Lake Superior, and that he remained a member of the company until his death in 1886 This company was organized on the joint-stock plan, with a capital divided into twenty thousand shares having a nominal or face value of five dollars each. At the time of his death Oliver held five thousand five hundred and eighty-two shares. By his will he made some specific gifts, and placed the residue of his large estate in the hands of trustees with directions to pay the net income derived therefrom to his daughter, during her life, and the principal, after her decease, to the Merchants' Fund Association for certain charitable uses. The Metalline *Page 58 
Land Company owned about six hundred acres of land when Oliver died, and two years later sold forty acres of it for a half million dollars. The larger part of this price has been divided by the company among its stockholders, and the dividend accruing to the Oliver stock is over one hundred thousand dollars. The daughter claims it as income; the appellant claims it as principal. To which of them should it be awarded ?
Before determining this question it will be best to consider some preliminary ones that lead up naturally to it. These are, first, what is the legal status of the company ? Second, what is the relation of the stockholders to the company ? Third, what is the interest of a stockholder in the company property ?
The company is unincorporated and is a partnership organized on the joint-stock plan by the contract entered into by its members. This contract designates and describes the business to be done, the capital to be used, and how it is to be paid in by the members, and limits the number of persons by whom the affairs of the company are to be conducted. It provides that the interest of each member, in the joint fund, is to be measured by his shares of stock, which he may sell and transfer without consultation with his associates and without impairing the power of the trustees or the existence of the company. The partnership thus formed, whatever the liability of its members to third persons may be, is an artificial juridical person capable of acquiring, holding, and selling property. Ordinarily, a partnership can convey its real estate only by the deed of all its members, but this company gave to its trustees power to buy, encumber, and sell land for it in their own names. It was a dealer in land as a commodity, using the names of its trustees in all its transactions. The principle that an unincorporated company or firm may deal in land, and that where it does so it holds the title, and may encumber or convey it, was settled in Brady v. Colhoun, 1 P. W. 140. The relation of the stockholders to the company is also settled largely by the articles of agreement. They contribute the capital, select the trustees who are to use and invest it, and are entitled to a distributive share of the profits made in the business. As between themselves, however it may be as to others, they are liable for losses in proportion to their stock. They have, however, no power to use the name of the company, to interfere *Page 59 
with its business, or to bind it in any manner. This power they have voluntarily surrendered, and have committed it to the trustees selected by them as the agents and representatives of the company; so that the firm or company speaks, not through its members as such, but through its trustees. These are liable for their fidelity to the trust, and for all profits made in the business, in substantially the same manner that a board of directors is liable to the stockholders in an incorporated company. In partnerships of the ordinary character, each partner is the agent of his firm, has personal contact with and control over its affairs, and the right to possession in common with his copartners of the firm property; but, under the agreement organizing the Metalline Land Company, the relation of the individual member to the firm was changed, and his rights reduced so that the stockholder had only a right to participate in the election of trustees, and to receive his share of the money made.
The interest of the stockholder in the company property is controlled by his relation to the company under his agreement and by the nature of the business done. The object in buying was not to mine or operate in any other manner, but to sell again so as to make gain by the purchase and sale of land, and the articles provided for the division of the profits made by such purchase and sale among the stockholders. The interest of each member was therefore an interest in the profits made. He had no title to the land bought by the trustees for the company, as a tenant in common or otherwise, and could neither convey nor encumber it. His interest in it was personal estate and the extent of that interest was shown by his certificates of stock: Kramer v. Arthurs, 7 Pa. 165; Brady v. Colhoun, supra. The company was the real owner of the land, and the trustees acting for it could alone encumber or convey it. The stockholder had, as a partner has, a resulting interest in the business and assets of the company, which can be legally ascertained only by an account: Meily v. Wood, 71 Pa. 488. The purchase of real estate by a firm or company dealing in it, is, as between itself and its members, a conversion of it into personalty, and the levy and sale of the land upon a judgment against an individual member of the firm passes no interest or estate in it to the purchaser. The creditor of one partner can acquire by levy and sale of his debtor's interest no greater right than his *Page 60 
debtor held, viz., the right to an account and to a distributive share of what may remain after the payment of the firm debts on final settlement: Ebbert's App., 70 Pa. 79; West Hickory M. Ass'n v. Reed,80 Pa. 38; Meily v. Wood, 71 Pa. 488. The interest of Oliver as a stockholder in the land company was, therefore, not that of a tenant in common of its lands, but that of one entitled to share in the profits of its business. The trustees under his will succeed him as holders of his shares, and their interest as such holders is neither greater nor less than his interest was while he was living.
The company was not dissolved by Oliver's death, and has not yet been dissolved. It has done but little business for several years, but it has paid the taxes on its lands and kept up its own organization, and still holds undisposed of nearly six hundred acres in the names of its trustees. The relation between it and the holders of its stock is, therefore, the same since Oliver's death as before. He had no title to the lands of the company while he lived, and none could pass from him to the trustees under his will by reason of his death. His interest as a stockholder was personal estate in his hands, and it is personal estate now in the hands of his representatives. The dividend made by the company out of the proceeds of the forty acres has the same character, and is governed by the same rules as though it had been made in his lifetime. It represents part of the difference between the cost of the land sold, including taxes and expenses, and the price received for it. That difference is the profit made by means of the purchase and sale of the land, which it is the duty of the trustees to divide among the stockholders. It is clear, therefore, that this dividend is personal estate, and represents gain or profit made in the proper business of the land company, that of buying land for purposes of sale, and selling it with a view to make gain for the stockholders. The will directs the payment of the net income from his estate, real and personal, to his daughter, and as this dividend represents income, it goes to the daughter and not to the remainderman. The shares are part of the residuary estate and belong to appellant. The profit accruing from the sale of lands is income from the investment in the stock of the land company, and if made since the death of Oliver, is not to be distinguished from income derived from any other source. *Page 61 
This leads us to the only other question, which is, When was the profit out of which this dividend is declared earned ? It is urged that it has not been earned since Oliver's death, and that for that reason, admitting it to represent profits, it belongs to the remainderman under the rule in Earp's App., 28 Pa. 368. The argument is that the phenomenal advance in the price of this piece of land is not due to anything done by the land company, by way of development or otherwise, but to the presence of a rich deposit of copper ore which was in place when Oliver died. For this reason, it is said, the real value of the land has not changed; nothing, therefore, has been gained by reason of anything done by the company.
The reply to this is that the object of forming the company was to buy lands in advance of any general knowledge of their mineral value, and, by means of openings or borings, develop their true value and then sell. Whether the work which demonstrated the existence of the deposit of copper on the forty acres was the work done by it or by its neighbors, is unimportant. The mineral value was made apparent in either case, and a sale at a greatly increased price made possible. The in creased price came, not from a change in the actual value, but from a correct knowledge of that value which increased the market price. This knowledge was acquired, and the price advanced in consequence of it, after Oliver's death. When he died the stock was thought to be of little value, and the lands could not have been sold at a profit. There were, therefore, no accrued or undivided profits to pass to the remainderman, and the wonderful advance made since his death has been earned, within the meaning of the rule in Earp's Appeal, by means of developments made in the neighborhood since the title was vested in the trustees named in his will. Earp's Appeal is, therefore, in harmony with our holding in this case. The same is true of Wiltbank's App., 64 Pa. 256, and Moss's App., 83 Pa. 264. In the latter case, the question was over the character of the option to subscribe for new shares of stock, belonging to existing stockholders by virtue of their ownership; and this court held that the option did not represent profits earned, but the right of the holder to increase his investment with a view to enlarged operations and greater profits to be earned thereby in the future. It belonged, therefore, to the owner of the stock and not to the owner of the income. *Page 62 
The circumstance that the entire block of shares in the land company was appraised at five dollars, is without significance. It is now clear that the shares are worth all that has been invested in them, and that the remainderman is many thousands of dollars better off than was supposed when the inventory was taken, but the net income is not his; that goes to the daughter.
The decree of the court below is affirmed, and the costs of this appeal are to be paid by the appellant.
* These accountants were the executors of the testator's will. On October 29, 1887, their account as such having been settled and audited, the Orphans' Court, holding that the will constituted them trustees of the residuary estate during the life of Catherine M. Richardson, awarded to them the principal thereof, to hold in that capacity: See Oliver's Est., 20 W. N. 318.
** For dissenting opinion, PENROSE, J., see Oliver's Est., 24 W. N. 141. *Page 408