## MATSON'S FORD BRIDGE CO. v. THE COMMONWEALTH.

ERROR TO THE COURT OF COMMON PLEAS OF DAUPHIN COUNTY.

Argued June 1, 1887—Decided January 3, 1888.

A bridge, belonging to an incorporated bridge company, was declared a county bridge under the act of May 8, 1876, P. L. 131. The damages awarded, and which were in excess of the capital stock, were divided among the stockholders in proportion to the shares of each: *Held*, that the excess of the award so distributed over the amount of the capital stock, represented a profit which the company made in its business, and was taxable for state purposes under § 4, act of June 7, 1879, P. L. 112.

Before GORDON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.; MERCUR, C. J., and PAXSON, J., absent.

No. 25 May Term 1887, Sup. Ct.; court below, No. 299 November Term 1886, C. P.

By the act of May 7, 1832, P. L. 528, the corporation named "The President, Managers and Company of the Schuylkill Bridge Company at Matson's Ford," was created, and under that act and its supplements of March 19, 1838, P. L. 121, and April 16, 1838, P. L. 625, the company, with a capital stock of $45,000, erected and maintained a bridge across the Schuylkill river at Conshohocken, in Montgomery county.

Under the act of May 8, 1876, P. L. 131, and the supplementary act of May 3, 1878, P. L. 41, proceedings were begun in the Court of Quarter Sessions to have this bridge declared a county bridge. The report of the viewers awarded damages to the company to the amount of $75,000. This report having been finally confirmed and certified, on June 11, 1886, the county commissioners paid the award, took possession of the bridge and caused the collection of tolls upon it to cease.

On September 15, 1886, under the provisions of the revenue act of June 7, 1879, P. L. 112, the auditor general made and the state treasurer approved a settlement for tax upon the capi-

tal stock of said company for the year ending first Monday of November, 1886. This settlement embraced a tax of 33 1-3 mills, amounting to $1,500, for "amount divided amongst the stockholders out of the sum realized from sale of company's property in excess of the amount paid in on capital stock, $30,000, being a dividend of 66 2-3 per cent. upon the capital stock of $45,000." From this settlement an appeal was taken to the Court of Common Pleas of Dauphin county, and the following specification of objections filed:

1. There was no dividend of sixty-six and two thirds per cent. declared and divided upon the capital stock of the company for the tax year ending the first Monday of November, 1886. The only dividend declared and divided thereon was one of fourteen per cent., and the tax imposed upon the capital stock measured thereby has already been paid by the company into the state treasury.

2. There was no division among the stockholders during said tax year of sixty-six and two thirds per cent. of profits, and, therefore, no tax can be imposed upon the capital stock of said company measured thereby.

3. The sum of thirty thousand dollars, which the accounting officers have regarded as a dividend and made the measure of the tax of fifteen hundred dollars upon the stock of the company, was not profit and income of the company, but was damages awarded to the company on account of the loss sustained by it from the taking of its bridge by the commissioners of the county of Montgomery, and the destruction of its business, and, therefore, does not furnish a measure for the tax upon the stock of the company as a dividend.

4. There is no law authorizing the imposition of the tax of fifteen hundred dollars upon said company in the manner in said account stated.

The issue, in the form of an action of debt, was tried without a jury before J. W. SIMONTON, P. J., who filed the following opinion and decree:

The defendant is a corporation which owned a bridge over the Schuylkill river at Matson's Ford in Montgomery county. It had a paid-up capital of $45,000. On June 12, 1886, the county commissioners took the bridge and the franchise of the

defendant to take toll for passage over it, under the act of May 8, 1876. The viewers appointed, as provided by said act, awarded to defendant as "damages sustained by the company," by reason of the said taking, the sum of $75,000, and this amount was, during the tax year, 1886, divided among the stockholders in proportion to the number of shares of the capital stock held by each. In the account settled by the auditor general and state treasurer against the defendant for tax on capital stock for said year, the excess thus divided above the amount of the capital stock of the company being $30,000 was treated as a dividend, and a tax of one half mill for each one per cent. of dividend, amounting in the aggregate to $1,500.00, was charged upon the capital stock in respect thereof, under § 4, act of June 7, 1879. Defendant, claiming that its capital stock was not legally subject to this tax, appealed from this settlement, and we have now to determine the question, thus raised, as to the validity of this tax.

The act of 1879 provides that where any corporation chartered by or doing business in this state, with exceptions which need not be noted here, makes or declares dividends during the tax year, which amount to six or more than six per centum upon the par value of its capital stock, it shall pay a tax upon its capital stock at the rate of one half mill for each one per centum of dividend so made or declared. If then the distribution of this $30,000 among the defendant's stockholders was the making or declaring of a dividend upon its capital stock the tax in question is legally imposed; otherwise it is not.

The nature of the tax on capital stock, and the principles on which it is imposed and assessed, are so fully stated and explained in Phœnix Iron Co. v. Commonwealth, 59 Pa. 104, and Commonwealth v. Railway Co., 74 Pa. 83, that it is sufficient on these points to refer to those cases. They show clearly that whenever any part of the property of the company is actually or potentially transferred from it to the stockholders, as a return for their investment, because they are stockholders, and in proportion to the number of shares held by each, such transfer is the making or declaring of a dividend, and its amount becomes the measure of the tax to be assessed on the capital stock. The transfer may be of actual

cash, or of stock purporting to represent, or actually representing, cash remaining in the treasury, or expended in increasing the value of the property of the company; or it may be an increase of capital stock, which is made the basis of dividends to the stockholders, although no dividend, even of stock, is formally declared: Lehigh Crane Iron Co. v. Commonwealth, 55 Pa. 448.

The mode provided for the assessment of the tax, by the act of 1879, and the acts on the same subject which preceded it, is based on the theory that the profits realized by the corporation, whether directly arising from its operations from year to year, or from the increase in the value of its property from whatever cause, will sooner or later reach the pockets of its stockholders, and that, when they do, they furnish a fair measure of the value of the capital stock, and, therefore, the amount of tax which it ought to pay. And upon the whole, no doubt, a practically fair result is attained.

It is true that the precise measure of the value of the stock in each and every year, may not be furnished by the dividend of that year. Thus a corporation may make a profit, in any given year, of sixteen per cent., and divide but ten. In that event, its tax for that year would be only at the rate of five mills on the par value of its capital stock, instead of eight mills, as it would have been if the sixteen per cent. had been divided. But the amount undivided will remain in the treasury of the company, to be divided the next or some subsequent year, or, if invested by the corporation, will increase the value of its property and thus enable it to make larger dividends in the future and consequently increase its rate of taxation, or, to make a stock dividend with a like result, or, to divide a larger surplus among its stockholders when it ceases business. In one form or other the profits will reach the stockholders, and in doing so will furnish a measure for the taxation of the capital stock.

Let us take as an instance, the corporation now before us. It made dividends from year to year, and paid taxes in proportion to these dividends. [If it had from time to time divided all its profits, it would have been worth, when wound up, or when its property and franchises were taken against its consent, just $45,000, the par value of its capital stock. But it

was found to be actually worth $75,000. Here there was
a gain of $30,000, which must have accrued either from
profits earned from year to year, which, instead of being
divided, were expended in increasing the value of its prop-
erty, or from the general increase in the value of property.
In either case, it is a profit which the company has made, and
has now divided among its stockholders, and the capital stock
was worth just $30,000 more because of it, than it would have
been without. If it accrued from profits undivided from year
to year, these, if they had been divided, would have furnished
an increased measure of taxation; if from an increase in the
general value of property, and a stock dividend had been made
to represent this increase in value, that also would have fur-
nished a measure for a corresponding increase in its tax. But
as it was never in any way divided until 1886, it could furnish
no measure of the value of the capital stock for taxation,
until then; having been then divided, it did furnish such
measure, and the capital stock was then properly taxed in
respect of it.] [3]

[It can make no difference in the result that the amount
was awarded by a jury of viewers under the name of dam-
ages. The money was received by the corporation and di-
vided among the stockholders, and its nature is precisely the
same, whether we call it purchase money, or damages, or by
any other name. The corporation wound up with $30,000 of
undivided profits, and when this was divided the tax neces-
sarily accrued.] [2]

The settlement appealed from was therefore correct, and
the commonwealth is entitled to judgment for the amount
imposed.

| | |
|---|---:|
| This amount is . . . . . . . . . . | $1,500 00 |
| Interest from November 15, 1886, to Jan-<br>uary 25, 1887, at 12 per cent., . . . | 35 00 |
| Attorney General's commission, 5 per cent., | 75 00 |
| Total . . . . . . . . . . . . | $1,610 00 |

For which amount let judgment be entered, if exceptions
be not filed according to law.

The company defendant filed exceptions, that the court
erred:

1. In not entering judgment in favor of the defendants; because the defendant bridge company did not sell its bridge and franchises, and did not voluntarily part with its property, but the same was taken by virtue of acts of assembly, which practically confiscated its property to the county of Montgomery as a free bridge. The relations hitherto existing between the state and the company ceased and determined the moment the court approved of the report of the grand jury freeing the bridge from tolls and transferring it to the county. And as all the taxes that had accrued and were due to the state immediately before said approval and taking, were paid by the company, the state by reason of said dissolved relations, has no claim upon the company, for it had voluntarily destroyed the plant that hitherto had borne its annual taxes from taxable profits or income, and with it the company's franchises and charter. Neither had the company any longer the protection the state gave it in the charter it had wiped out. The dissolution and divorce of all relations, claims, and demands between the state and the company were complete the moment the court approved the report of the grand jury and transferred the property to the county. After the state had thus cut loose from the company and left it to its fate, the company did not, because it was powerless to do so, receive any income or profits whatever upon which a tax could be levied, and the only money the company received was for the damages done the defendant by the action of the state and now it claims to share with the defendant the damages suffered at its hands. As, therefore, the reasons given by the learned court for entering judgment in favor of the plaintiff do not apply to the case at bar, they were erroneous.[1]

2. In that part of the opinion embraced in [ ][2]

3. In that part of the opinion embraced in [ ][3]

On April 19, 1887, the exceptions were severally overruled and judgment directed to be entered in favor of the commonwealth for the sum found due by the court. Thereupon the defendant took this writ, assigning as errors the overruling of said exceptions, respectively.

*Mr. James Boyd* and *Mr. Lyman D. Gilbert* (with them *Mr. Chas. H. Stinson* and *Mr. John H. Weiss*), for the plaintiff in error:

The question may be stated: Are "damages" named in § 3 of the act of May 8, 1876, P. L. 131, to be regarded as a dividend of corporate profit when received by the stockholders, if they exceed the amount of the capital stock of the corporation?

1. The cases of Lehigh Crane Iron Co. v. Commonwealth, 55 Pa. 448; Phœnix Iron Co. v. Commonwealth, 59 Pa. 104, and Commonwealth v. Railway Co., 74 Pa. 83, do not, in our judgment, furnish either argument or authority for the position that these "damages" are a "dividend" for taxing purposes. In each instance where the taxing demand of the state was sustained, there was a division of profits arising from the transaction of corporate business and the exercise of the corporate franchise. A case cannot be found which decides that a state can destroy a franchise, pay "damages" for its destruction, and yet treat the "damages" as profits arising from the exercise of the franchise.

2. The state gave to this corporation the franchise of building and taking tolls upon a bridge over one of its great rivers, upon condition that it would use it. The bridge was built, maintained, and tolls taken, until the state authorized the public to take the bridge and retake the franchise of the corporation. Every act done and every word spoken were those of the state. When it passed the act of 1876, the property of this company was two-fold; the visible, physical structure, and the invisible franchise; and the act provided that not merely the tangible property of the company should be taken, but also its right to take tolls, the franchise to be a bridge company, and payment was to be made to the company for the loss it sustained.

3. Seeing that the capital stock of the company was $45,000, the court drew the conclusion, without testimony, that there had been a vast appreciation of the value of the tangible property of the company, and that $75,000 represented the actual value. The state cannot ask the court in a tax case to infer a fact: Commonwealth v. Railroad Co., 74 Pa. 94. It must be that under the act of 1876, the state intended that the county should pay, not merely for the bridge and appurtenances taken, but also for the franchise extinguished. The court cannot infer that the excess of $30,000 did not represent the

value of that franchise. The viewers declared that the damages due the company were $75,000; and we submit that it would be an impairment of the constitutional right to reimbursement to lessen this compensation due from the public under the guise of taxation to be paid to the public.

4. That the said $30,000 is corpus or capital and not taxable as a dividend fund, we confidently assert is shown by the decided cases: Vinton's App., 99 Pa. 440: Phila. Cont. for Ins. v. Commonwealth, 98 Pa. 48; Fox's App., 112 Pa. 337; Montgomery County v. Bridge Co., 110 Pa. 54; Commonwealth v. Drexel & Co., 1 Pears. 337.

*Mr. Deputy Attorney General John F. Sanderson* (with him *Mr. Attorney General W. S. Kirkpatrick*), for the defendant in error:

1. It is submitted that the settlement made against the plaintiff in error by the accounting officers is, prima facie, correct and conclusive, unless appealed from. Upon taking the appeal the appellant is bound to specify the objections he relies on. When the case thus made comes to trial in the court below, the commonwealth makes her case by producing in evidence the report rendered by the appellant to the auditor general, and the account settled thereon. It then devolves upon the appellant to show the appeal, and to make out by proof any matters of fact tending to impeach the rectitude of the settlement. If the appellant allege that the damages assessed as the value of the franchise were not taxable as a dividend, it devolves upon it to show the value of the franchise, and thereby point out the amount alleged to be exempted from taxation. No such evidence was offered in this case, and there is none to show affirmatively that any part of the value of the franchise was included in the amount of $30,000 divided among the stockholders. There was no evidence to show the original value of the property and franchise.

2. The court, therefore, applied the natural presumption, that the amount of the capital stock represented the original value of the property of the company, and that the difference between the amount of the capital stock and the amount of damages represented an increase in the value of that property. It very properly inferred that the difference represented a

profit to the company; and it is respectfully submitted that it makes no difference whether the appreciation resulted from an appreciation in the value of the physical structure through improvements made thereof, or otherwise, or whether it represented an increase in the value of the franchise, considered apart from the structure, or whether it represented an appreciation of the value of both. In either case, the appreciation was a gain and profit to the stockholders, and the amount thereof, represented by $30,000, was divided among them. The original value of the structure is not shown, nor its value when taken. The original value of the franchise, which was a free gift from the state, if it had any value separately considered, is not shown, nor its value when taken. How then has the defendant overcome the natural inference that the difference between the capital of the company and the value of its property represents a gain to the stockholders? If it be conceded that when the franchise was taken it had a value, and if it be conceded, as may be fairly assumed, that the difference between the amount of the capital stock and the amount of damages awarded, representing an increase in the value of the corporate property as a whole, included, not only an appreciation in the value of the physical structure, but also an appreciation in the value of the franchise, why may not such appreciation be taxed, even though a part of the tax is a deduction from the profit resulting from the increased value of the franchise?

3. It is fair to assume that the whole value of the property and the franchise was paid. The measure of the damages was their full market value, and presumptively that full market value has been realized; at least there is no allegation to the contrary. If this be so, what matters it whether the full market value be realized from a sale lawfully made to a purchaser, or whether it results from the taking of the property under the power of eminent domain? In either case a profit arises to the corporation. In either case the full amount of the compensation is received by it. The amount of $75,000 · was paid by Montgomery county to the bridge company without any diminution. No more nor less could be done by a private party. What matters it, therefore, whether the profit arose from a transaction indirectly with the state, or through

a transaction with a private individual? Suppose a corporation had a contract with the state to furnish public printing, and upon such contract profits accrued, does it impair the obligation of the contract of the state, to tax a dividend made out of such profits, under a general law by which dividends of corporations generally are taxed?

The practical and controlling fact in this case is that the stockholders of the bridge at Matson's Ford invested $45,000 and received in return for that investment $75,000. What logic can demonstrate that they did not realize a profit thereby of $30,000?

OPINION, MR. JUSTICE CLARK:

The defendants in pursuance of an act of assembly of May 7, 1832, P. L. 1831-2, 528, and the several supplements thereto, erected and for many years have maintained a bridge across the Schuylkill river at Matson's Ford, Conshohocken, in Montgomery county. The capital stock of the company was $45,000, all of which was paid in. Under the act of May 8, 1876, P. L. 131, and its supplements, proceedings were had to declare the bridge a county bridge; viewers were appointed, who reported in favor of the applicants, and that by means of the taking of the bridge for public uses the president, managers, and company of the Schuylkill bridge, at Matson's Ford, would sustain damages to the amount of $75,000; the report was subsequently approved by the grand jury, with the concurrence of the court, and on June 12, 1886, the county commissioners took possession of the bridge, and caused the collection of tolls to cease, having first paid to the bridge company the $75,000 damages.

On September 15, 1886, the auditor-general with the approval of the state treasurer, under the provisions of the act of June 7, 1879, made a settlement for taxes upon the capital stock of the bridge company, embracing a tax of $1,500, being at the rate of 33⅓ mills, on the ground that the company had divided amongst the stockholders $30,000 out of the sum realized from the sale of the company's property, in excess of the amount paid in on capital stock, which was alleged to be a dividend of 66⅔ per cent. on their capital stock. An appeal was taken to the Common Pleas of Dauphin county, and the

settlement was by that court sustained.    The error assigned is to the decree of the court sustaining this item in the settlement.

It is clear that $75,000 was awarded to the company as the value of its property; the award was of damages, but the damages were necessarily computed upon the value of the private property, which had been taken and applied to the public use.    The transaction between the state and the company under the act of May 8, 1876, cannot perhaps be characterized as a sale, but the title to the bridge property passed from the company to the commonwealth under it, as it would under a contract of sale.    The commonwealth had a right to take the property for public use, by paying the price which might be placed upon it by viewers appointed for that purpose, pursuant to law.    The franchise of the company was rendered wholly valueless by the creation of a free bridge, and the company was obliged to and did at once discontinue the corporate business; the value of the bridge and also of the franchise which was thus destroyed is represented in the award of $75,000: Montgomery County v. Schuylkill Bridge, 110 Pa. 54.    This action of the company would not ordinarily effect a technical dissolution, but it was the undoubted right of a merely business corporation, when its property was appropriated to public use, to wind up its affairs, and, after payment of its debts, to distribute its property among the holders of the stock.    The distribution is in all respects the same as if made on an actual legal dissolution.    The stockholders were entitled, first, to receive the amount of their capital stock; and, second, their proportion of the surplus, according to the number of shares held by them respectively.    This surplus whilst the bridge was in operation was in some sense, perhaps, part of the capital; but when the time came for a distribution it was clearly a surplus of profits arising out of the business, either from an accumulation of undivided gains or from the general appreciation of the property.    The design of the act of 1879 is accurately stated by the learned judge of the court below: "The theory of the act is that the profits realized by the corporation, whether directly arising from its operations from year to year, or from the increase in the value of its property from whatever cause, will sooner or later reach the pockets of

the stockholders, and that when they do, they furnish a faii measure of the value of the capital stock, and, therefore, the amount of tax which it ought to pay." The tax is on the capital stock, not on the dividends: Phœnix Iron Co. v. Comm'th, 59 Pa. 104. The case just cited was determined upon the acts of May 29, 1844, and April 12, 1859, the provisions of which, however, were in this respect similar to the provisions of the act of 1879. The whole sum distributed represents the actual value of the shares, but the value for taxation is to be fixed by the aggregate of the dividends of profits made or declared during the fiscal year. It is not required in order to determine the value of the capital stock, that the dividends shall be formally declared; a profit made or passed to the stockholders becomes the measure of the state tax. The formal declaration of a dividend is conclusive; the company is estopped by it whether the dividend be earned or not, but it is not conclusive, in respect of the commonwealth, that all the earnings and profits of the year have been embraced in it. "The precise measure of the value of the stock in each and every year," says the learned judge of the court below, "may not be furnished by the dividend of that year. Thus a corporation may make a profit, in a given year, of sixteen per cent. and divide but ten. In that event, its tax for that year would only be at the rate of five mills on the par value of its capital stock, instead of eight mills, as it would have been if the sixteen per cent. had been divided. But the amount undivided will remain in the treasury of the company to be divided the next or some subsequent year; or, if invested by the corporation, will increase the value of its property, and thus enable it to make larger dividends in the future, and consequently increase its rate of taxation; or to make a stock dividend with a like result; or to divide a larger surplus among its stockholders when it ceases business. In one form or other the profits will reach the stockholders and in doing so will furnish a measure for the taxation of the capital stock."

Upon a full examination of the whole case, we are of opinion that the conclusions of the court below are in accordance with the spirit and purpose of the act of 1879, and that the fund of $30,000 is a profit which the company made in its business; and, as that profit has been divided among the stock-

holders because they are such, and in proportion to the number of shares held by each, such a transfer must be treated as the making of a dividend, the amount of which declares the measure of tax to which the capital stock is subject.

The judgment is affirmed.