## Mearkle Estate

662

*Montgomery, McCracken, Walker & Rhoads* and *W. H. Lathrop*, for accountant.

*Robert A. Webster, George V. Strong and William G. Ferguson*, for claimants.

*Daniel I. Murphy*, p. p., trustee ad litem.

*Ralph C. Donohoe*, for Commonwealth.

BOLGER, J., June 3, 1960. — Decedent died February 20, 1936. This trust arose under his will dated August 25, 1934, a copy of which is annexed.

Testator gave his residuary estate in trust to pay three-fourths of the income to his widow, Charlotte H. Mearkle, for life, and the remaining one-fourth of income to his adopted daughter, Alice Mearkle Satterthwaite, for life. Upon the death of his widow, which occurred January 2, 1959, three-fourths of the principal is to be divided, one-half thereof to be paid as the widow might appoint by will and the other half to be added to the trust for the adopted daughter. Should the widow fail to appoint one-half of her share, the said share is to be paid to those persons who might become entitled thereto under the Intestate Laws of the Commonwealth. ". . . and in the same proportions as provided by such laws, had I died at the time fixed for the said distribution, seized and possessed thereof, unmarried, intestate and without issue;".

Letters of administration c. t. a. have been granted to Alice Mearkle Satterthwaite and Harland O. Mearkle by the Register of Wills of Philadelphia County.

Alice Mearkle Satterthwaite, the adopted daughter, survives.

By an instrument dated October 26, 1951, Charlotte H. Mearkle, the widow, released her right to exercise the power of appointment in favor of herself, her estate, her creditors and creditors of her estate.

By her will, since duly probated in the office of the Register of Wills of Philadelphia, she failed to expressly exercise the power of appointment, but by item 17th of her will provided:

"All the rest, residue and remainder of my estate, real, personal and mixed, of whatsoever kind and wheresoever situate, I give, devise and bequeath unto Raymond A. Sarkees, absolutely and in fee, Provided however, if he should predecease me, then I give, devise and bequeath all the rest, residue and remainder of my estate, as aforesaid, unto my daughter, Alice M. Satterwaite."

Raymond A. Sarkees survived Charlotte H. Mearkle and by a writing dated April 6, 1959, assigned all of his interest in the principal over which Charlotte H. Mearkle had power of appointment to Harland O. Mearkle and Alice M. Satterthwaite.

At the death of Charlotte H. Mearkle, numerous individuals, descendants of brothers and sisters of testator, were living and would have inherited from testator had he died at that time intestate, unmarried and without issue.

It is stated that the estate of Charlotte H. Mearkle is insufficient to pay in full the cash legacies provided for in her will.

By decree dated October 26, 1959, Daniel I. Murphy, Esq., was appointed trustee ad litem for all unborn and unascertained persons, including such as may be minors, who are the issue of deceased brothers and sisters of Harry L. Mearkle. His reports will be considered hereinafter.

The statement of proposed distribution suggests the following questions for adjudication, viz.: (1) Do the pecuniary legacies contained in the will of Charlotte H. Mearkle and the residuary clause of that will effectively exercise the power of appointment by virtue of section 14 (14) of the Wills Act of April 24, 1947, P.L. 89, despite the partial release of the general testamentary power? (2) If the power is not effectively exercised, are the collateral heirs of testator entitled to distribution of the three-eighths of principal which is now to be distributed or is Alice M. Satterthwaite, the adopted daughter of testator, to receive the entire share?

The auditing judge finds that this case is controlled by Jeffers Estate, 394 Pa. 393 (1959), in which case a release had been executed and delivered reducing objects or classes of persons in whose favor the power might be exercised. The will also contained

a residuary clause. The general power given by the donor became a special power and in the absence of a specifically expressed intention by testatrix, the power was not exercised under section 14(14) of the Wills Act of April 24, 1947. The facts are almost identical with the facts in the present case.

The claim has been asserted by executrix of the estate of Charlotte Mearkle that the power has been exercised pro tanto to the extent that the estate of Charlotte Mearkle is insufficient to pay legacies given thereunder.

In view of Jeffers Estate, supra, which carefully reviews the decisional law which preceded the Wills Act of 1947, this contention by executrix is entirely without basis and the request that $10,000 be awarded to executrix is dismissed.

The next question for determination involves an interpretation of the will. Having found that Charlotte Mearkle did not exercise her power of appointment, we must now consider testator's express intention concerning the disposition of the three-eights of his estate which is now to be distributed in default of the exercise of the power by his widow. Testator said that in default of the exercise of the power given to his wife, the three-eights of the corpus was to be paid ". . . to those who would have become entitled thereto under the laws of the State of Pennsylvania and in the same proportions as provided by such laws had I died at the time fixed for said distribution seized and possessed thereof *unmarried, intestate and without issue* ." (Italics supplied).

In construing this will it is important to consider that testator gave to his sister or her surviving children $6,800; to his brother or surviving children, $10,000. He also made substantial cash legacies to various designated nieces and nephews. He refers to his adopted daughter as "my adopted daughter, Alice

Mearkle Satterthwaite," and he provided for her by giving one-fourth of the income from the entire corpus even during the lifetime of his wife, Charlotte, and upon the death of his wife directed that one-half of the corpus which had been producing income for the benefit of his wife be added to the share of income to be paid to Alice for life and finally provided that, upon her death, principal supporting the income to which she may be entitled for life is to be paid to the descendants of Alice Mearkle Satterthwaite per stirpes and should there be no such descendants, gave her a general testamentary power of appointment and then stated ". . . but in default of such appointment, then to those who would have become entitled thereto under the laws of the State of Pennsylvania, and in the same proportions as provided by such laws had I died at the time fixed for said distribution seized and possessed thereof *intestate, unmarried and without issue.*" (Italics supplied.)

Testator was not unmindful of his collateral heirs. In the disposition of his estate he clearly intended that his adopted daughter would receive a life estate in one-fourth of income during his wife's life; that she might receive principal under the will of Charlotte Mearkle if his wife so provided. Testator further intended that Alice's children would ultimately receive whatever might remain of at least five-eighths of principal, but provided that in default of the exercise of either power, his collateral heirs would be his ultimate beneficiaries.

To hold that the adopted daughter was to be the substituted heir in default of the exercise of the power by his wife is to ignore the plain, unambiguous meaning of the words used in describing the class which is to receive principal.

It has been argued on her behalf that testator, by using the word "issue," intended that Alice would take

if living but in the event that she predeceased Charlotte, her issue were intended to be excluded. This is strained and is inserting words which a reading of the will from its four corners fails to supply. If testator had intended Alice to be the taker in default, no meaning can be ascribed to the carefully worded designation of the class of persons and the reference to the proportions set forth in the will. Howlett Estate, 366 Pa. 293, and Collins Estate, 393 Pa. 195, are inapposite.

The claim of Alice Mearkle Satterthwaite, as the sole next of kin, to the corpus which is presently distributable, is dismissed.

During the period covered by the accounting, two apportionable events have occurred relating to decedent-owned stock. An apportionment calculation was submitted which, if followed, would result in an allocation from principal to income of $25,568 with respect to the stock of Philadelphia Screen Manufacturing Company and $1,002 with respect to the sale of 100 shares of United States Steel Corporation.

The guardian and trustee ad litem has objected to the allocation of the above amounts. Both apportionable events grew out of the sale of stock and the amount of the gain to be allocated to income in each instance is the cause of the controversy.

### Philadelphia Screen Manufacturing Company

At the continued audit a stipulation of facts was submitted. The guardian and trust ad litem made no objection to the veracity of the facts set forth therein, but objected to the relevancy of many of the facts.

His objections are overruled.

Referring to the stipulation, we find that at the time decedent died, he owned 400 shares of the stock of the corporation. This represented four-fifteenths of all of the stock issued and outstanding. Two other persons each owned 50 shares. Another person had one share and C. P. Bentley held 555 shares and

the remaining 444 shares were held by a corporate guardian for Alvin Bentley, a minor. Alvin Bentley received his shares apparently at his.majority on January 12, 1940. During the period between February 20, 1936, the date of decedent's death and July 15, 1955, when the stock was sold, the corporation paid out in dividends only 12½ percent of its total net profits.

When decedent died, his executors placed an inventory value of $136 per share on the stock. At that time the book value was $182.67. The stock was sold for $200 per share and at the time of sale the book value of the stock was $545.33 and it is acknowledged that this appreciation in value grew out of undistributed profits. The guardian ad litem contends that the intact value of the corpus represented by these shares must remain in principal and any balance can then be allocated to income.

At a later hearing the guardian and trustee ad litem stated that instead of approximately $6,900 being allocated to income, it was his opinion that only $233 should be so applied. He gave as his reason the fact that the balance sheets of July 31, 1935, and July 31, 1936, revealed a $35,000 decrease in earned surplus of which $25,000 represented a write-down on certain stock held by the corporation. He relies upon Harvey Estate, 395 Pa. 62 (1959), as his authority for this proposition. This contention of the guardian and trustee ad litem is dismissed not only because as he readily admits it is the exact converse of Harvey Estate, supra, but requests the auditing judge to recognize the imponderable of an opinion of value which the Supreme Court refused to do in the cited case.

Counsel for the income beneficiaries although originally contending that inventory value was the correct measuring rod, advanced the argument that the ratio between the sale price and book value at the time the

sale took place would properly represent the true rate of discount which the executors should have used in establishing inventory value. This argument although ingenious is rejected as being too supposititious to accomplish the purpose of the rule of apportionments in Pennsylvania.

The auditing judge is convinced that the question is a narrow one and that the solution depends upon the determination of what was the intact value of corpus represented by the 400 shares of stock at the time of decedent's death.

As early as Moss Appeal, 83 Pa. 264, and as recently as Cunningham Estate, 395 Pa. 1, the Supreme Court has said that intact value with reference to decedent-settlor-owned stock is not market value, but *is prima facie* book value. Many cases which need not be cited have stated that the application of the rule may vary in each case, in other words, each case is sui generis.

Counsel on both sides have failed to cite any authoritative precedent for the application of the rule to stock of a closely held corporation where the marketability of the security is so limited.

Is this a factor which affects the intrinsic value of the security? I believe that it is vital in determining the actual worth of the security in dollars to this estate.

Par value of stock is not book value because when death occurs the so-called intrinsic value or book value includes earned but not distributed profits, accruals and appreciation which the balance sheet may manifest. In order to participate in accrued earnings, it is essential that the corporation first declare a dividend: Green v. Philadelphia Inquirer Company, 329 Pa. 169. If the appreciation in value, without considering earned surplus, is to be enjoyed, the estate can derive no benefit from this increment unless there is a liquidation.

When this decedent died, his estate as the successor-stockholder was in no position to enforce the declaration of a dividend much less the liquidation of the corporation and yet if book value is the sole measuring rod, then dividends and liquidation of corporate assets are *mere possibilities* but without any substantial value in actual realization.

If a security is well known and actively traded, the existence of a substantial earned surplus is often a material inducement for buyers to offer increasing prices in anticipation of a dividend declaration. In a large measure even this depends upon many imponderables and the factual situation of an existing policy of a large corporation measured by its conduct in the past with reference to dividends in one form or another.

With respect to the Philadelphia Screen Manufacturing Company stock, the controlling interest had only to wait until the offer to sell was at a price which would be attractive to them, the only potential buyers. As a matter of fact, when we consider that the book value on the date of sale was $545 and book value on the date of death was $182, it is apparent that the entire $200 per share paid by the buyer actually came from accrued and undistributed profits of the corporation.

I, therefore, find that inventory value as determined by the executors in 1936 was the intact value which is to be restored in principal out of the proceeds of the sale and the balance of the purchase price, less the proportionate share of capital gains tax which may have already been paid out of principal, is to be allocated to income.

*United States Steel Corporation*

At the time of his death, decedent owned 100 shares of United States Steel Corporation stock which was inventoried at 63⅝ per share. At that time the book

value of the 100 shares was $169.38 per share. In June of 1949, the corporation split three for one. In December 1951, the trustees sold 100 shares of the new stock for $39.60 per share. Although it is not involved in the present problem, it should be noted that in June 1955 the corporation again split its stock two for one.

The trustee has calculated that the proceeds of sale of 100 shares in 1951 netted $3,959.92. They have computed the cost for inventory value of the 100 shares at $2,120.83 and have found by reference to the balance sheets that the earnings per share represented $10.02 and, therefore, have allocated $1,002 to income. The guardian and trustee ad litem contends that since the intact value of the shares sold was $5,-646 and only $3,959.92 was realized, all of the proceeds of the sale must remain in principal.

For the reasons stated in concluding that inventory value is correct, I believe that market value of a security such as United States Steel should represent intact value. However, I am nevertheless bound by the decisions of the Supreme Court in the many cases including Nirdlinger Estate (No. 1), 327 Pa. 160, and McKeown's Estate, 263 Pa. 78, to the present time.

Counsel for the life tenants has cited the Estate of Laura J. Roberts, no. 3717 of 1932, which was followed in the Estate of William Clare Allison, no. 455 of 1954. In both of these cases the court was concerned with trustee-purchased stock. These cases were followed by Justice Stearne's decision in Arrott Estate, 383 Pa. 228, in which purchase price represented the intact value of the stock purchased.

In deciding Arrott Estate, supra, the court reaffirmed its decision that with respect to decedent-settlor-owned stock, book value must be at least prima facie intact value.

In both Nirdlinger Estate, supra, and the cases cited therein, the allocation of a part of a gain to income is

measured by one of two standards: (a) Retention in dollars of the book value of the stock at the date of purchase, and (b) undistributed earnings held by the corporation during that period which is measured by the time the trust held the security. If there were no undistributed earnings which accrued during that time, any gains would go to principal.

The guardian and trustee ad litem states in his report that in paragraph eighth testator gave to his executors and trustees ". . . in addition to and not in limitation of the authority given them by law, shall have and exercise the following powers: . . . (c) Power to keep principal intact by the gradual transfer from income account of sums sufficient to cover premiums for investments." He then notes several transactions in which premiums were paid for bonds and that the bonds ultimately were either sold or redeemed and the premiums paid although charged to principal, were not restored out of income. The request that specific charges be made against income is denied. I do not consider the language contained in this will is mandatory, but was intended to be discretionary.

The guardian and trustee ad litem further suggests that counsel fee and costs amounting to $3,165.75 should not be charged entirely against principal. He suggests a formula for apportioning these charges.

His recommendation is not accepted. Such charges will be made against the outgoing share in accordance with discretion lodged with the court and for the reason that it would be unfair to impose similar charges at the termination of the trust against the share that continues in trust.

The guardian and trustee ad litem suggests that compensation should not be determined at the present time in view of the possibility of further litigation. This suggestion is adopted. However, when compensa-

tion has been determined, it is to be charged against the outgoing share of principal. . . .

And now, June 3, 1960, the account is confirmed nisi.